**De'Andre WILLIAMS, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 11–CF–526.

District of Columbia Court of Appeals.

Argued Jan. 9, 2013.

Decided Oct. 10, 2013.

Peter H. Meyers, Washington, DC, for appellant.

David B. Goodhand, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, Eliza-beth Trosman, Gary Wheeler, and John Cummings, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN, BLACKBURNE-RIGSBY, and BECKWITH, Associate Judges.

BECKWITH, Associate Judge:

Two nights after a double murder in northwest Washington, D.C., police arrested appellant De'Andre Williams near the site of the killings, reporting that Mr. Williams had just dropped a revolver and run from officers investigating an unrelated crime. A federal jury soon acquitted Williams of the resulting charge that he, as a convicted felon, possessed the revolver—but that did not settle the issue whether police in fact caught him with a gun that night. That is because the gun, a forensic examiner determined, could have been the murder weapon. At Williams's subsequent murder trial, the government called several witnesses to tell the story of the police chase, his arrest, and the recovery of the revolver, while Williams argued that after losing sight of the man they were chasing, police misidentified him as the one who dropped the gun. Evidence that Williams possessed the gun two days after the murders bolstered the government's circumstantial case against Williams, and the jury convicted him of the two murders and related charges.

Mr. Williams argues that he should have been allowed to tell jurors that the federal jury acquitted him in the gun possession case, so that they could conduct a "fair and balanced consideration of the evidence." This issue is one of first impression for this jurisdiction. Williams urges the court to adopt a rule that under certain circumstances recognized in a number of states, a trial court must admit evidence of the defendant's prior acquittal. We decline to

adopt such a rule. Although we conclude that a trial court has discretion to admit evidence of a not-guilty verdict, we hold that the trial court here did not abuse its discretion in refusing to admit evidence of Williams's acquittal. We also reject two other claims made by Williams. Some of his convictions merge, however, so we remand to the trial court with instructions to vacate them and resentence Mr. Williams.

## I. Background

Duane Hicks and Passion McDowney were each shot in the head and killed as they sat in Mr. Hicks's parked car the night of August 12, 1999. Arguing the motive for the crime was robbery, the government presented a narrative of the shooting through an eyewitness who testified that immediately after firing six shots through the front passenger window, the shooter went around to the driver's side, opened the front door, and grabbed a package the size of a loaf of bread from inside. The shooter ran off, but the witness was unable to give more than a general description of him and could not identify anyone when shown a photographic lineup. The witness said he then left the scene, in the 1300 block of Hamilton Street, and soon recounted the shooting to an officer he found outside a nearby Georgia Avenue restaurant.

Only two things in the government's case linked Mr. Williams to the crime in any significant way. He presented a strong defense to each of them.[1] First, the government's eyewitness, Mark Coleman, testified that before the shooting, he saw the shooter lean with his hand against the roof of the car, between the two passenger-side doors, "like he was waiting for somebody to acknowledge he was there." Police recovered a latent palm print from this part of the roof, and an analyst, who later faced fierce cross-examination by the defense, testified the print's upper area matched that of Williams's palm print.[2] Defense counsel challenged Mr. Coleman's statement that the shooter touched the car—a detail police did not record until after the palm print test was done, months into their investigation—as part of the shifting tale of a witness who wanted to be helpful and embellished his story to give police what they wanted. Williams supported this theory with forensic evidence that Mr. Hicks and Ms. McDowney were shot from the backseat of the car, not from the direction of the passenger window.[3]

---

1. This trial was hard-fought. It was the government's fourth attempt to try and convict Mr. Williams of the murders after a warrant was issued for his arrest in 2001. The first prosecution ended in mistrial, and two later juries deadlocked on the question of his guilt. This time, the trial court made a number of comments about the balance of evidence in the case, including noting that defense counsel had conducted "as effective a cross-examination as I've ever seen of the fingerprint expert that the Government put on," and that counsel could make a motion for judgment of acquittal at the close of the government's evidence "with a straight face." At a post-trial proceeding, the judge went further, telling Williams that his lawyers "fought very hard," that "I thought you had a real shot at this thing," and that "this verdict could have gone either way."

2. In challenging this evidence, the defense also called a friend of Mr. Williams who testified that they lived in the same neighborhood as Mr. Hicks and frequently hung out on the street where Hicks parked his car, a black Infinity J30. Counsel later argued that since no one could say when the palm print was made, there was little reason to assume it was made by the shooter or by Williams on the night of the murders—both Williams and Hicks "were around the same area, ... everybody hung out on these blocks day to day and ... Duane had a new car, quite honestly that a lot of people liked."

3. In yet another line of defense, counsel established that the police received tips on two other suspects while investigating the murders. One suspect, Kevin Easterling, admit-

The government spent significantly more time proving another link between Mr. Williams and the murders: Williams's arrest two nights afterward in what was at the time an unrelated incident. That night, someone robbed a CVS on Georgia Avenue. Collis Timlick, an officer looking for the armed suspect, saw a black man riding a bicycle nearby and wearing clothing similar to the robber's. When Officer Timlick approached him, the man rode away, and as Timlick gave chase on foot, the man fell from his bicycle, dropping a .38 Smith & Wesson Special before continuing to flee. While Timlick stayed with the gun, another officer nearby heard his description of the runner over the radio and chased a similarly dressed man he saw running down Georgia Avenue, until the man dashed out of sight behind a row of houses on Hamilton Street. A third officer, one of several searching the area after the runner disappeared, found Williams lying down next to a fence behind one of the houses.

The government presented six witnesses to show that Mr. Williams was in possession of the .38, including the three officers involved in the arrest. Timlick and another officer identified Williams as the man they chased in connection with the CVS robbery. Two civilian witnesses— Williams's close friend Michael Johnson and Raquia Addison, a former girlfriend— testified that they spoke with Williams shortly after his arrest. According to them, Williams told each of them the police had caught him in possession of a gun and suspected him of robbery. Ms. Addison also was shown the .38 at trial and said it was the same gun she saw Williams with "two or three" times before the shooting.[4] The defense, meanwhile, elicited testimony from officers that CVS employees said Williams was not the robber. And Mr. Johnson's testimony from a previous trial, which was read into the record here, demonstrated that Williams was charged not with the robbery but with possessing the dropped revolver.[5] Counsel impeached Addison with prior statements implying the police merely were *claiming* Williams had a gun and that she did not know any details of what Williams's gun looked like; the defense also prompted Johnson to say Williams had claimed he was misidentified not only as the robber but also as the person who dropped the gun. Finally, the

ted to shooting Mr. Hicks and Ms. McDowney from the backseat, according to what his girlfriend told police. The lead investigator on the case testified, however, that the girlfriend later took back her story, and he said fingerprint testing for Easterling was negative. A defense witness, Angelyn Whitehurst, who lived on the street where the murders happened also said that while she did not see the shooting itself, she heard the shots and looked out her window. She gave police the name of John Daughtry, an acquaintance she recognized walking the street before the incident and walking away immediately afterward.

4. Mr. Williams apparently talked with these two civilian witnesses from jail: his former girlfriend testified she asked him "what he was locked up for," and his friend said Williams told him he "got picked up for something they thought he did on [Georgia] Avenue."

5. The relevant excerpt from the cross-examination of Michael Johnson, read into the record during the government's case, is as follows:

Q: And he told you that ... they were looking for someone who just robbed the CVS, correct?
A: Yes, ma'am.
Q: And that he had not done that, correct?
A: Yes, ma'am.
Q: That he was indeed not charged with robbing or attempting to rob the CVS, correct?
A: Yes, ma'am.
Q: And that he was charged with having a gun which was not his, correct?
A: Yes, ma'am.

defense argued that Williams's presence in the area of his arrest was innocent, while the real suspect got away, citing testimony that Williams visited a friend nearby that night and that people often walked the alley behind the Hamilton Street houses.

Testimony about the CVS incident was important to the government's proof because a police firearms expert concluded the revolver could have fired the bullets recovered from the murder scene.[6] Although the parties extensively litigated before each trial whether this evidence was admissible in the first place,[7] it was only at Mr. Williams's fourth trial that the defense sought, mid-trial, to tell the jury that Williams was acquitted of gun possession. While questioning the lead detective in the murder investigation about the revolver, counsel began to ask about the acquittal—"And you know that on December 20th, of 1999 Mr. Williams was found not guilty of having ..."—when the trial court sustained a government objection to the question. The trial court then had this to say at a bench conference:

> I think the fact that he is found not guilty is not relevant evidence in this case. Indeed, it's not even relevant as to whether he really had the gun or not. The jury has heard that testimony, and they can make up their own mind about it. He's not being tried for that in this case that he has been acquitted, but that's not relevant evidence. And, you put it before the jury.

6. The firearms examiner testified the bullets fired at Mr. Hicks and Ms. McDowney could have come from one of two types of handgun made by one of five companies, including the .38 Smith & Wesson. But after firing the revolver for comparison, the examiner said, there were not enough markings on the bullets to confirm or eliminate the gun as the murder weapon.

7. The defense asserted that evidence of prior gun possession was inadmissible "other

Later, counsel asked the trial court twice to take judicial notice of the acquittal, arguing that "[t]his is so prejudicial that my client has been accused of having the weapon without a jury balancing it with an acquittal." The judge declined, however, noting that despite the defense's calls for him to exercise discretion and let in the acquittal, he had reviewed case law on the matter and concluded "that the law says that that verdict does not come into this case." The jury found Williams guilty of two counts each of first-degree premeditated murder (while armed) and felony murder, along with other charges. The trial court sentenced him to a prison term of 90 years with a mandatory term of 65 years.

## II. Analysis

Mr. Williams makes three primary claims: (1) the trial court erred in not allowing him to enter into evidence the fact of his acquittal on a federal felon-in-possession charge; (2) the trial court violated his right to have the government preserve discoverable and potentially exculpatory evidence, under the Due Process Clause of the Fifth Amendment to the United States Constitution and Super. Ct.Crim. R. 16; and (3) the trial court erred in not declaring a mistrial because an improper exhibit was given to jurors during deliberations.

### A. Acquittal Evidence

 Mr. Williams's first claim concerns the admissibility of evidence of his

crimes" evidence, *see Drew v. United States*, 331 F.2d 85 (D.C.Cir.1964), and that the government was collaterally estopped by the verdict in the federal trial from attempting to relitigate whether Mr. Williams possessed the gun two nights after the murders. According to a defense motion, the only issue at the federal trial was identification, since Williams stipulated that he was a felon. The trial court rejected both claims, and Williams does not appeal those rulings.

prior acquittal. In exercising its discretion to admit or exclude evidence, "the trial court must take three intellectual steps," making sure the evidence is both competent and relevant, and if so, determining whether "certain countervailing circumstances outweigh probative value, e.g., prejudice, confusion of the issues, cumulative testimony, [or] undue delay." *Keene v. United States*, 661 A.2d 1073, 1076 (D.C. 1995) (quoting *Johns v. United States*, 434 A.2d 463, 473 (D.C.1981)). The admissibility of evidence is a decision committed to the trial court's discretion. *Id.* Even if, as Williams claims, the trial court in his case refused to exercise discretion, instead adhering to a rigid rule of inadmissibility, our review of the judge's decision still would be for abuse of discretion—not, as he argues, a true de novo review. *See id; (James W.) Johnson v. United States*, 398 A.2d 354, 363 (D.C.1979) ("Failure to exercise choice in a situation calling for choice is an abuse of discretion.").

This court has not addressed whether a defendant may tell jurors he was acquitted in a prior trial when the government seeks to prove facts related to the previously adjudicated charges. The issue seems most likely to arise in a situation like this one, where the government succeeds in an attempt to present evidence of the defendant's prior bad acts or "other crimes," either because the prior acts are relevant for some other purpose than disparaging the defendant's character or because the prior acts are directly relevant to proof of the crime currently charged. *See (William A.) Johnson v. United States*, 683 A.2d 1087, 1092–93, 1096–98 (D.C.1996) (citing *Drew v. United States*, 331 F.2d 85, 89–90 (D.C.Cir.1964)). Because Williams does not raise them, we do not have occasion to decide two issues also not yet directly addressed by this court but implicated in this situation: first, whether the fact of an acquittal should have any bearing either on the admissibility of the evidence of other acts or, relatedly, on a judge's finding by clear and convincing evidence that the defendant committed the prior acts, *see Johnson*, 683 A.2d at 1101;[8] and second, whether collateral estoppel principles apply under these circumstances.[9] We recognize that Williams's attempts to inform the jury of his acquittal represented his last effort to mitigate the damaging testimony concerning his gun possession in what was a close, completely circumstantial case. But we also note that he now

---

8. Though it did not squarely address the admissibility of acquitted conduct, in *Roper v. United States*, 564 A.2d 726 (D.C.1989), this court found it "disturbing, and fundamentally unfair, that one could be acquitted of a crime by the trier-of-fact, yet have it held that that evidence of that same charge would have been admissible against him in another trial." *Id.* at 732. But a year later, on a related issue, the Supreme Court held that collateral estoppel and federal cases concerning prior bad acts did not prohibit the admission of evidence of acquitted conduct unless the prior jury had determined "an ultimate issue in the present case." *Dowling v. United States*, 493 U.S. 342, 348, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990). And more recently, in *Bacchus v. United States*, 970 A.2d 269 (D.C.2009), this court allowed admission of other crimes evidence even though criminal charges based on the prior acts were dismissed for want of prosecution and thus not adjudicated at all. *Id.* at 274–75 (distinguishing *Roper*).

9. In *Dowling, supra* note 8, the Supreme Court indicated that even when a prior jury's acquittal determined an issue of ultimate fact, collateral estoppel would not bar evidence of that fact in a new proceeding where the burden of proof for that fact was lower than the burden in the prior acquittal. *Dowling*, 493 U.S. at 347–50, 110 S.Ct. 668. This court applied *Dowling* in *(Donnell) Johnson v. United States*, 763 A.2d 707 (D.C.2000), where the government was allowed to present evidence of acquitted conduct in the defendant's probation revocation proceeding, conducted under a preponderance standard. *Id.* at 709.

challenges only the final link in the chain of decisions that allowed jurors to consider this evidence in spite of the acquittal.

The admissibility of acquittal evidence in this context is a complex issue, one that courts have treated in different ways. Many, such as the majority of federal circuits, have held that such acquittals are "not generally admissible." *See, e.g., United States v. Vega,* 676 F.3d 708, 720 (8th Cir.2012) (internal quotation marks omitted).[10] In the view of these courts:

> The general rule is that although a judgment of acquittal is relevant with respect to the issues of double jeopardy and collateral estoppel, once it is determined that these pleas in bar have been rejected, a judgment of acquittal is not usually admissible to rebut inferences that may be drawn from the evidence that was admitted. [*United States v. Wells,* 347 F.3d 280, 286 (8th Cir.2003) ] (quotations and citations omitted). "[T]wo primary reasons" exist as to "why a judgment of acquittal is not generally admissible to rebut inferences that may be drawn from evidence that was the basis of a previous trial." *Id.* (quotation and citation omitted). The first reason is that "judgments of acquittal are hearsay." *Id.* (quotation and citation omitted). The second reason is that "judgments of acquittal are not generally relevant, because they do not prove innocence; they simply show that the government did not meet its burden of proving guilt beyond a reasonable doubt." *Id.* (quotation and citation omitted).

*Vega,* 676 F.3d at 720. Federal courts also have noted that "even if not for these barriers to admissibility, evidence of a prior acquittal will often be excludable under Fed.R.Evid. 403, because its probative value likely will be substantially outweighed by the danger of prejudice, confusion of the issues, or misleading the jury." *United States v. De La Rosa,* 171 F.3d 215, 219–20 (5th Cir.1999) (internal quotation marks omitted); *see also Comford v. United States,* 947 A.2d 1181, 1186 n. 11 (D.C. 2008) (noting that this jurisdiction has adopted the Rule 403 balancing test).

On the other hand, various state courts have emphasized a trial judge's discretion in evidentiary decisions and identified circumstances where acquittal evidence is admissible. *See, e.g., Kinney v. People,* 187 P.3d 548, 556 (Colo.2008) (citing cases); *Hess v. State,* 20 P.3d 1121, 1125 (Alaska 2001) (though usually not relevant to prove factual innocence, "evidence of an acquittal may have an alternative purpose—to help the jury weigh the evidence of the prior act"); *People v. Griffin,* 66 Cal.2d 459, 58 Cal.Rptr. 107, 426 P.2d 507, 511 (1967) (acquittal evidence is relevant and not hearsay when "assisting the jury in its assessment of the significance of the evidence of another crime with the knowledge that at another time and place a duly constituted tribunal charged with the very issue of determining defendant's guilt or innocence of the other crime concluded that he was not guilty").

In *Kinney,* the Colorado Supreme Court stated that evidence of acquittal "is appropriate when the testimony or evidence presented at trial about the prior act indicates

---

**10.** The vast majority of federal appellate courts appear to adhere to this pronouncement. *See United States v. Thomas,* 114 F.3d 228, 249–50 (D.C.Cir.1997); *United States v. Marrero–Ortiz,* 160 F.3d 768, 775 (1st Cir. 1998); *United States v. Viserto,* 596 F.2d 531, 537 (2d Cir.1979); *United States v. Gricco,* 277 F.3d 339, 352 (3d Cir.2002); *United States v. De La Rosa,* 171 F.3d 215, 219–20 (5th Cir.1999); *United States v. Jones,* 808 F.2d 561, 566–67 (7th Cir.1986) *United States v. Sutton,* 732 F.2d 1483, 1489 (10th Cir. 1984); *United States v. Irvin,* 787 F.2d 1506, 1516–17 (11th Cir.1986).

that the jury has likely learned or concluded that the defendant was tried for the prior act and may be speculating as to the defendant's guilt or innocence in that prior trial." 187 P.3d at 557. Although the Colorado court identified this limited trigger for admission, nothing in its opinion suggested jurors' consideration of the acquittal should similarly be limited to ending their speculation about the prior trial. The court instead noted that it considered "the admissibility concerns raised by the federal circuits ... not persuasive," that evidence of acquittal "would make it less probable that the prior act occurred as the testifying witness has alleged that it did," and regarding the hearsay problem, that the acquittal "could still be admitted [if not for its truth,] for the limited purpose of challenging the weight the jury should give the prior act evidence presented at trial." *Id.* (citing *Hess,* 20 P.3d at 1126).

█ We similarly see no reason to impede, by announcing a rule of general inadmissibility, the trial court's traditional discretion in admitting or excluding evidence. State courts, as in *Kinney,* often have advocated a "case-by-case" approach to admitting an acquittal, *id.,* and many of the federal courts addressing this issue have acknowledged that it is ultimately a discretionary decision. *See, e.g., De La Rosa,* 171 F.3d at 219–20 ("We have squarely held that, as a general matter, a trial court does not abuse its discretion in excluding evidence of a prior acquittal on a related charge."). As an initial matter, with respect to the federal courts' view that judgments of acquittal are hearsay,[11]

those decisions largely overlook the extent to which a judgment of acquittal may be admissible under the public record exception to the hearsay rule. We also hesitate to conclude that acquittal evidence is flatly irrelevant, as the federal courts have indicated.[12] The threshold for relevance in this jurisdiction is logic-based and relatively low. *See Curry v. United States,* 520 A.2d 255, 268 (D.C.1987) ("Evidence is both relevant and material if it has some logical tendency to prove or disprove a fact which is at issue in the trial."); *Punch v. United States,* 377 A.2d 1353, 1358 (D.C. 1977) ("Relevant evidence is that which tends to make the existence or nonexistence of a fact more or less probable than would be the case without that evidence." (citation omitted)). The fact that the government failed to meet its burden in a previous trial, while bringing its prosecutorial power to bear directly upon proving that the defendant committed the prior crime, has at least some tendency to prove that the defendant did not do it.

At the same time, however, we agree with the federal cases to the extent that they indicate evidence of an acquittal often will be of limited relevance to prove or disprove a fact at issue in the prior trial. *See United States v. Jones,* 808 F.2d 561, 566 (7th Cir.1986). A general verdict of not guilty means only that jurors felt the government was unable to prove at least one element of a multi-faceted criminal charge. Typically, then, a judge viewing an acquittal afterward would not know where jurors felt the government fell short of the mark. *See Dowling v. United*

---

11. *See United States v. Bailey,* 319 F.3d 514, 518 (D.C.Cir.2003) ("Where either [a conviction or an acquittal] is offered to show commission or noncommission of the acts in question, they are hearsay: in effect they simply quote the assertion of 12 jurors (who did not themselves perceive the acts charged) that the person did or didn't do the acts.").

12. The federal courts' seemingly rigid rule on the relevance of acquittal evidence may explain why the judge in Mr. Williams's trial said both that he considered the prior verdict irrelevant and that the cases held it inadmissible.

*States,* 493 U.S. 342, 352, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990) ("There are any number of possible explanations for the jury's acquittal verdict at Dowling's first trial"). And without that knowledge, the judge likely would have difficulty concluding that the acquittal's probative value outshone any risk that jurors would see the verdict as conclusive proof that the defendant did not commit the prior acts—especially when it would not be clear to jurors how to compare the previous trial to the current one, during which the government may present evidence not admitted at the prior trial.

■ Whether or not a judgment of acquittal offered to establish the truth of the jurors' conclusion of not guilty might fall within a hearsay exception, *see Young v. United States,* 63 A.3d 1033, 1044 (D.C. 2013) ("An out-of-court statement offered in evidence to prove the truth of the matter asserted is hearsay whether the statement is quoted verbatim or conveyed only in substance; whether it is relayed explicitly or merely implied; whether the declarant is identified or not."), we find in both state and federal cases a relevant, non-hearsay use for evidence of acquittal: that is, to correct for the likelihood that jurors have made a mistaken inference that the defendant was tried and found guilty of the prior crimes. We find compelling the argument that if jurors heard—along with evidence that the defendant actually did the prior acts—evidence indicating he also was arrested and tried for them, the defendant would be prejudiced if jurors incorrectly assumed he had been found guilty. Jurors making that leap would be likely to abandon consideration of the evidence being presented to them on the pri-

or acts, especially when that evidence was weak or equivocal, allowing their assumption of conviction to lead inexorably to an assumption that the defendant in fact committed the acts. Using evidence of an acquittal to correct such an assumption and thus refocus jurors' attention on the evidence at hand would not depend on the truth of the acquittal. The judgment of acquittal therefore could be admissible because (1) the record of acquittal, though offered for the truth of its statement that the jurors in fact found the defendant not guilty, would have a hearsay exception as a public record, and (2) any assertion conceivably made by the jurors in their verdict would not be offered for its truth. The only barrier to its admission then would be the Rule 403 balancing test.[13]

*Kinney's* statement on when acquittal evidence is appropriate, 187 P.3d at 557, is an obvious recognition of this prejudice, but federal courts have taken notice, too. In *United States v. Tirrell,* 120 F.3d 670 (7th Cir.1997), the Seventh Circuit upheld a trial court's decision to admit evidence of a prior incident for which the defendant had faced criminal charges in state court. *Id.* at 674. While Tirrell had been convicted on one of the state charges and acquitted on others, the trial court admitted evidence related to all of his prior acts but excluded evidence of acquittal. *Id.* In affirming the decision, the Seventh Circuit noted, significantly, that the judge "excluded all references to the prior prosecution and did not allow the government to inform the jury that Mr. Tirrell had been convicted of the state firearms charge." *Id.* at 678. Similarly, in *Dowling,* the Supreme Court was assured that the admission of evidence of the defendant's prior

---

**13.** As noted *supra, Kinney* on its face would not limit jurors' consideration of the acquittal to the narrow purpose of correcting an improper inference of guilt. The acquittal would be hearsay, however, when used for purposes that depend on the truth of the verdict. A limiting instruction therefore may be appropriate.

crimes was not prejudicial in part because the judge had twice instructed jurors that the defendant was acquitted of the prior crimes. *See* 493 U.S. at 346, 353, 110 S.Ct. 668. In *United States v. Bailey*, 319 F.3d 514 (D.C.Cir.2003), moreover, the trial judge "expressed his concern that there might be an improper jury inference that Mr. Bailey was convicted" of charges related to other acts that had not been adjudicated but did not allow the defendant to present evidence that he had not yet been tried for them. *Id.* at 519 (internal quotation marks and brackets omitted). The D.C. Circuit, finding error, cited numerous cases where a federal court's "dominant purpose" in finding evidence relevant was "to refute a likely mistaken jury inference." *Id.* at 518.

In *Kinney*, a jury note made it obvious that jurors were speculating about the defendant's guilt in the prior trial. But that determination may not always be as clearcut as it was there. While hearing only that a defendant was arrested in the prior case might not always lead jurors to infer that he was convicted, we think the assumption may be likely. That theory would appear to be the basis for our cases holding that under certain circumstances even evidence of a prior arrest may be inadmissible *Drew* evidence because "the jury may infer from the prior criminal *conviction* that the defendant is a bad [person] and that he [or she] therefore probably committed the crime for which he [or she] is on trial." *Clark v. United States*, 639 A.2d 76, 79 (D.C.1993) (empha-

sis added) (quoting *Bennett v. United States*, 597 A.2d 24, 27 (D.C.1991)). *Bailey* presented a similar situation, where the court admitted evidence of prior drug transactions the defendant had not yet been tried for. There, "[t]he government's evidence of the crimes took the form of the arresting officers' testimony about the narcotics transactions and the ensuing arrests." 319 F.3d at 518. The court stated, "We think that if the jury inference [of guilt] is plausible, evidence to rebut that inference is relevant." *Id.* And the court evidently felt it plausible enough that jurors had made the inference, based only on evidence of the defendant's arrests, to hold that the judge erred in refusing to admit evidence that he had not yet been tried.[14] However certain we could be in a given case that "jurors know that not all people who are arrested are guilty," *Bennett*, 597 A.2d at 28, we would be at least as sure that the more jurors heard about a prior trial or proceeding—coupled with evidence of the defendant's interaction with the criminal justice system related to the acquitted conduct—the more likely they would be to assume that the defendant had been found guilty.

Turning to the trial court's decision here, we do not read the judge's remarks the way Mr. Williams wants us to, as indicating the judge was refusing to exercise discretion. The record shows the judge considered the acquittal irrelevant "as to whether [Williams] really had the gun or not," and that he thought that cases

14. The D.C. Circuit in *Bailey* was not faced with the same hearsay problems as courts addressing whether acquittal evidence should be admitted, because the defendant there instead sought only to introduce evidence that he had not yet been tried. 319 F.3d at 518–19. As noted, however, the *Bailey* court relied on several cases, including acquittal evidence cases like the Seventh Circuit's *Jones*, where courts had identified potential preju-

dice from a jury's mistaken inference of guilt in a prior adjudication. *See id.* at 518. Although *Jones* indicated there might be hearsay problems for acquittal evidence even when offered only to correct the jury's mistaken inference, the *Jones* decision ultimately was made on the grounds that it would have been more unfairly prejudicial than probative to admit the acquittal under Rule 403. *See id.* (citing *Jones*, 808 F.2d at 566–67).

dictated its inadmissibility. These statements seem only to indicate the judge was following—and agreed with—the federal cases, not that he was adhering to his own rigid policy of inadmissibility.[15]

■ We cannot conclude that the judge's ruling on relevance grounds constituted an abuse of discretion. It is unclear, first of all, whether that was the judge's only reason for excluding the evidence, since he referred to cases finding acquittals inadmissible, and those cases typically identify relevance, hearsay, and prejudice grounds. And relevance is, as our opinion makes clear, a finer point when the only proffered use of the acquittal is to prove that the defendant did not commit the prior acts or to challenge the government's evidence that he committed them. The probative value of a not-guilty verdict may increase with the likelihood that jurors in the prior case acquitted the defendant on a narrow issue. But with the differing burdens of proof involved here—unlike the jury in Mr. Williams's gun possession trial, the judge in his murder trial did not have to find beyond a reasonable doubt that he possessed the gun—we cannot say the judge abused his discretion in finding the prior acquittal irrelevant. At any rate, the trial court's relevance determination would have been closely intertwined with the Rule 403 balancing test, which necessarily would have taken into consideration the limited probative value of the acquittal to prove innocence and the danger that jurors would have been confused by it or overvalued it.

Even if defense counsel's argument for admission—that the jury should have been able to "balance" the gun-possession evidence with Mr. Williams's acquittal—gave the judge any occasion to consider whether to admit it for the narrow purpose of correcting jurors' inference of guilt, we still cannot conclude it would have been an abuse of discretion to exclude it. At trial, jurors heard evidence that Williams was chased down and arrested after police identified him as a suspect in the CVS robbery *and* saw him with a gun. The only time jurors heard that he was charged not with the robbery but with gun possession involved counsel's passing questions to Michael Johnson, see *supra* note 5—questions that understandably did not mention Williams was charged with being a *felon* in possession of a gun. The only mention of the trial connected with Williams's gun arrest also came through defense questioning and made reference only to a "proceeding" before "United States District Judge James Robertson," in which the testifying officer had made prior statements. Because of Williams's misidentification defense, counsel had to make repeated reference to Williams's arrest photo and other aspects of his involvement with police [16]—but the government

---

**15.** As the government notes, when this issue came up in the middle of trial, the trial court listened to counsel's arguments and a couple of times offered counsel the opportunity to brief whether the court could take judicial notice of the acquittal. Counsel did not file a brief, although she continued to object and argue it was a discretionary call for the judge. That the judge offered to read briefing on the issue, however, indicates he in fact considered it a matter within his discretion.

**16.** We do not hold these references against Mr. Williams, nor do we suggest counsel purposely asked about the arrest to open the door to acquittal evidence, something that other courts have concluded was improper. *See, e.g., Marrero–Ortiz,* 160 F.3d at 775. That references to his arrest and charge were important to the defense, however, demonstrates that the trial court did not abuse its discretion in the context of mitigating prejudice from any possible inference of guilt. As a pretrial matter, the trial court could have proposed excluding any reference to Mr. Williams's arrest, jailing, or criminal charge, but we cannot say whether the defense would have

did not appear to exploit this fact to create an inference of guilt either by harping on Williams's contact with the police or referring to the fact that a jury already had considered his gun possession case. In fact, the government did not once mention the word "arrest," "charge," or "jail" when discussing the CVS incident during its initial closing argument. In its rebuttal argument, the government listed several pieces of evidence connecting Williams to the revolver, including testimony from Mr. Johnson and Ms. Addison that Williams was "arrested with his gun." Just like the testimony at trial, however, this reference did not suggest to jurors that Williams was arrested for gun possession and charged with that crime any more than it suggested he was arrested and charged for the CVS robbery. Emphasizing that Williams was arrested and charged specifically with gun possession more plausibly would have created an "inference of guilt" of gun possession, *Bailey,* 319 F.3d at 518, but the record does not reveal that this happened here.

While jurors likely assumed that Mr. Williams's arrest did not end the story, we cannot find an indication in the record that they would have speculated about the outcome of a gun-possession trial, especially when testimony that Williams was not identified as the CVS robber would have cast some doubt both on his being the robber and the person who dropped the gun. The record does not disclose a danger that jurors would have abandoned the actual evidence before them of Williams's gun possession by relying on what they incorrectly supposed was a prior conviction. For all of these reasons, we conclude that the trial court did not abuse its discretion in excluding evidence of his acquittal.

agreed to the exclusion as a matter of strate-

## B. Preservation of Evidence

Mr. Williams next argues that his convictions should be reversed because the trial court erred in refusing to dismiss the case in light of the government's failure to preserve Duane Hicks's car and the clothing worn by Mr. Hicks and Passion McDowney when they were killed. He argues his case should have been dismissed because the police, by failing to collect the clothing and keep the car, violated his rights to due process and to discover potentially exculpatory evidence under Super. Ct.Crim. R. 16.

 Our cases recognize that:

[T]he government has a general duty to preserve discoverable evidence under Super. Ct.Crim. R. 16(a)(1)(c) and long-established case law. *See Myers v. United States,* 15 A.3d 688, 690–91 (D.C. 2011) (citing *United States v. Bryant,* 142 U.S.App.D.C. 132, 140–141, 439 F.2d 642, 650–651 (1971)). Nevertheless, "unless a criminal defendant can show bad faith on the part of the police, [the] failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Arizona v. Youngblood,* 488 U.S. 51, 58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988).

*Bean v. United States,* 17 A.3d 635, 638 (D.C.2011). The decisions whether and how to sanction the government for a violation of Rule 16 are committed to the discretion of the trial judge. *Id.* (citing *Cotton v. United States,* 388 A.2d 865, 869 (D.C.1978)). This determination depends in part on how culpable the government was in losing or destroying the evidence. *See Cotton,* 388 A.2d at 869. When a defendant seeks the full sanction of dismissal for his case, however, this court has held that "*Youngblood* . . . controls," *United States v. Day,* 697 A.2d 31, 36 (D.C.

gy.

1997), requiring a showing of bad faith on the part of the police. *See id.* at 35 (citing *Youngblood,* 488 U.S. at 58, 109 S.Ct. 333).

On appeal, Mr. Williams argues mainly that the trial court erred in refusing to dismiss his case, and thus his claim must succeed or fail based on the bad-faith inquiry of *Youngblood.* Before his first murder trial, the judge presiding at the time held a hearing on the issue of sanctions and listened to testimony from the lead investigator in the case as well as a forensic expert hired by the defense. The judge found that while the police acted negligently, there was no evidence that it was out of bad faith that they failed to collect the clothes or released the car to its lienholder just weeks into the murder investigation. The defense evidently did not renew its motion for sanctions during Williams's fourth trial, and counsel has not made the entirety of the original sanctions hearing part of the record on appeal.[17] At the fourth trial, however, the government and defense counsel elicited a significant amount of testimony regarding the release of the car and the failure to collect clothing. Assuming that this issue was properly preserved, we can find no basis—either in the trial testimony or the portion of the sanctions hearing included in the record—to overturn the first trial judge's factual finding of no bad faith.[18] *See Robinson v. United States,* 825 A.2d 318, 325 (D.C. 2003) ("We will not disturb a trial court's factual finding, such as the court's determination in this case that the police did not act in bad faith, unless the finding is plainly wrong or without facts to support it." (internal quotation marks and brackets omitted)).

Mr. Williams points us to only one instance where a lesser sanction was requested at any time during any of his four trials—a motion for a missing-evidence instruction counsel made before his first trial. According to the government's brief, the trial judge deferred ruling on this motion, but then that trial ended in mistrial before the close of evidence. We can find no record of any sanction being requested again. Assuming the trial court denied a motion for a missing evidence instruction, and that Williams preserved a challenge to such a decision, we would conclude that the denial was harmless.[19] After cross-

---

17. It is unclear whether Mr. Williams's sanctions motion before his first trial has preserved for appeal his sanctions motion under either *Youngblood* or Rule 16. *See Medrano–Quiroz v. United States,* 705 A.2d 642, 648 (D.C.1997) (noting that "a party who neglects to seek a ruling on his motion fails to preserve the issue for appeal" and that "where the circumstances have changed as the case has progressed" a prior-made motion must be renewed "on the basis of the changed circumstances" (citations omitted)).

18. It is somewhat troubling that, in the middle of a murder investigation with no eyewitness or physical evidence pointing strongly to the identity of a shooter, police failed to collect the victims' clothing and released the car—essentially the preserved crime scene—after at most eight weeks, especially in light of an internal policy requiring that the car be kept for three years. It is equally troubling that the lead detective in the case was apparently mistaken about this policy, that the car was left unsecured after being processed by the police, and that an Assistant United States Attorney authorized the car's release. We are not reassured by testimony that police are "caught in the middle" when the owner of a car involved in a murder investigation asks for it back, and that collecting the clothing may not have helped the investigation because the victims were shot in the head and not the body. Carelessness is not commensurate with bad faith, however, and this testimony—along with the strong defense Mr. Williams was still able to mount—confirms our deference to the trial court's factual finding of negligence but not bad faith.

19. Under the harmlessness standard for non-constitutional error, we can say, "with fair assurance, after pondering all that happened

examining officers about their failure to collect and preserve evidence and asking defense experts what additional conclusions they could have reached if they had been able to test the car and clothing, trial counsel argued forcefully for jurors to find reasonable doubt in various gaps in the police investigation. Even though the defense could not independently test the clothing or car, its expert blood and bullet-wound analysis of police photographs and measurement of a different car that was the same model as Hicks's allowed counsel to make a compelling case for a backseat shooter. We thus cannot conclude that any denial of Rule 16 sanctions was reversible error, or that the failure to dismiss the case deprived Williams of due process.

## C. Unauthorized Exhibit

Mr. Williams also claims that his convictions should be reversed because during deliberations jurors were given the complete transcript of Angelyn Whitehurst's testimony. This transcript should have been redacted to keep out portions excluded when counsel read the prior testimony into the record during Williams's final trial. Counsel moved for a mistrial when it came to light during deliberations that jurors had the unredacted transcript of Ms. Whitehurst's testimony and wanted to know at which of Williams's prior trials she testified. Whitehurst was the defense witness who lived close to the crime scene and testified she saw John Daughtry and another man outside her apartment the night of the murders. In a portion of her testimony that should have been redacted, Whitehurst said that on a later date she saw Daughtry and the other man by a bus stop and felt "threatened." Although Whitehurst had clearly testified that she did

not see Williams on the night of the murders, the jurors' note expressed confusion about an admitted portion of the transcript where Whitehurst looked in court at a man defense counsel referred to only as "the gentleman seated to my left"—obviously Williams—and said she had not seen him that night.

■■■■ The judge denied the mistrial, instructed the jury it had received an exhibit that was not entered into evidence, and sent them back to deliberate with the redacted testimony "to make sure that you know that this is the only part of her testimony that's admissible in this trial." We will reverse a trial court's refusal to grant a mistrial "only 'in extreme situations threatening a miscarriage of justice.'" *Wright v. United States*, 637 A.2d 95, 100 (D.C.1994) (quoting *Goins v. United States*, 617 A.2d 956, 958 (D.C.1992)). When it is clear that jurors unintentionally received an unauthorized object in the jury room, moreover, we do not review an appellant's claim as "a constitutional error under either the Fifth or Sixth Amendments. [Instead,] the proper standard for evaluating a claim of prejudicial error when an unauthorized object is inadvertently or mistakenly transmitted to the jury room is whether the judgment of the jury was 'substantially swayed' by the presence of the unauthorized evidence in the jury room." *Vaughn v. United States*, 367 A.2d 1291, 1294–95 (D.C.1977).

Submitting to the jury Ms. Whitehurst's full testimony, much of which was not entered into evidence, clearly was error, but it was inadvertent. *See id.* at 1294. Mr. Williams's claim that he was prejudiced by this error assumes two things happened, of

without stripping the [allegedly] erroneous action from the whole, that the judgment was not substantially swayed by the error," and thus that Mr. Williams's substantial rights

were not affected. *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)

which there is no direct support in the record: first, that any juror read the portion of the full transcript where Ms. Whitehurst said she felt "threatened" by Daughtry and the other man, and second, that jurors believed the other man may have been Williams. Because the record shows that a juror marked a different portion of the transcript in pencil, Williams argues, the danger that both of these things took place is too great to find the error harmless. But we agree with the government that even if jurors read Whitehurst's testimony about feeling threatened by Daughtry and the other man, the context of this testimony made it clear that Whitehurst was speaking of the two men she saw outside her apartment the night of the murders—neither of whom was Williams, according to her clear testimony.

■■■ It is disquieting that jurors were confused about Whitehurst's failure in court to recognize someone who the context clearly showed was Williams. That moment was not obviously connected, however, to the "other man" Whitehurst saw the night of the murders. And it appears from the record that the court responded to the jurors' question, telling them it was in fact Williams whom Whitehurst failed to identify in court as one of the people she saw the night of the murders. If there were any hint in the record that jurors believed Williams had threatened Whitehurst, our opinion (and likely the trial court's mistrial ruling) would be different. *See Gordon v. United States,* 783 A.2d 575, 586 (D.C.2001) ("[E]vidence concerning a witness'[s] fear tends to be extremely prejudicial because it appeals to the passions of the jury and may cause the jury to base its decision on something other than the rule of law.") But on the record before us, and in light of the judge's instruction for jurors to disregard the unredacted transcript they received, we cannot say with fair assurance that the jury's verdict was substantially swayed by giving them the unredacted transcript. *See Vaughn,* 367 A.2d at 1296 (declining to reverse where "the inadvertent mistake is discovered [and] . . . a curative instruction is promptly given").

## D. Merger

Mr. Williams was convicted of two counts each of first-degree premeditated murder and felony murder, as well as four counts of possession of a firearm during a crime of violence (PFCV). He argues that several of his convictions merge and should be vacated for purposes of double jeopardy. We agree. The government acknowledges that since there were only two decedents, two of his murder convictions must be vacated. *Lester v. United States,* 25 A.3d 867, 872 (D.C.2011) ("A defendant cannot remain convicted of premeditated murder and felony murder of the same decedent." (citation omitted)). The government also acknowledges that the four PFCV convictions should merge into one because the murders happened as a result of a "single shooting incident with multiple victims." *Wages v. United States,* 952 A.2d 952, 964 (D.C.2008).

## III. Conclusion

For the foregoing reasons, we remand to the trial court to resentence Mr. Williams upon vacating two of his murder convictions and three of his PFCV convictions. In all other respects, we affirm the judgment of the trial court.

*So ordered.*