*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press*.

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 15-CF-1082

DAMIAN SMITH, APPELLANT,

09/21/2017

FILED
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF2-14109-13)

(Hon. Neal E. Kravitz, Trial Judge)

(Submitted December 20, 2016                    Decided September 21, 2017)

*William C. Claiborne, III* was on the brief for appellant.

*Channing D. Phillips*, United States Attorney, and *Elizabeth Trosman*, *Elizabeth H. Danello*, *Andrew Floyd*, and *Janani J. Iyengar*, Assistant United States Attorneys were on the brief for appellee.

Before EASTERLY, *Associate Judge*, and WASHINGTON,[*] and FERREN, *Senior Judges*.

Opinion for the court by *Senior Judge* FERREN.

Concurring opinion by *Senior Judge* FERREN at page 35.

---

[*] Judge Washington was the Chief Judge of the court at the time this appeal was submitted. His status changed to Senior Judge on March 20, 2017.

FERREN, *Senior Judge*: Appellant, Damian Smith, was convicted of possession with intent to distribute a schedule I controlled substance,[1] "3-4 methylenedioxypyrovalerone" (MDPV), commonly known as "Bath Salts." He appeals his conviction, arguing for reversal on two grounds: (1) the government failed to preserve physical evidence material to the defense and discoverable pursuant to Super Ct. Crim. R. 16 (a)(1)(C); and (2) there was insufficient evidence to justify Smith's intention to distribute the MDPV found in his possession. We affirm.

## I. Facts and Proceedings

On July 20, 2015, a jury found Smith guilty of Possession with Intent to Distribute (PWID) based on his possession of MDPV. According to the government's evidence at trial, he had been arrested on August 9, 2013, after his girlfriend, Iesha Miller, called the police from her apartment. When Officer Armand Artinian responded to the call, he saw Smith on the couch without pants, dressed in his boxer briefs. Before taking Smith into custody, Officer Artinian asked him if he had pants he could wear. According to Artinian, Smith replied that he had clothing in Miller's car, but Miller interjected that Smith had "some

---

[1] D.C. Code, § 48-904.0l (a)(l) (2001).

clothing in the bedroom." Officer Artinian retrieved a pair of shorts from a bed in the bedroom, and Miller confirmed that these were the clothing she had in mind.

The officer then "walked over to Mr. Smith [with the shorts] and said, 'Here. Put these on.'" Smith declined to do so (in Artinian's words) because "they were not his" — they had "a hole in the crotch or a tear in the crotch."[2] The officer then searched the shorts, found and removed "a bag full of white pills," handed the shorts to Smith, and directed him to put them on. Smith did so and was photographed wearing the shorts. This photograph was admitted in evidence at trial over defense objection.

Smith was wearing the shorts when he was transported to the D.C. jail, and although the corrections officials took the shorts in exchange for jail garb, they were not formally seized as evidence by the government. Smith was detained in the jail for six months for violation of the terms of release on an unrelated domestic

---

[2] Later, at trial, counsel for Smith also argued to the jury that a few days before Smith was arrested, Miller had hosted an overnight party of 25 or so others a few days earlier, one of whom could have left the shorts behind.

violence charge and for sundry parole violations. He never retrieved the shorts,[3] which apparently were destroyed.[4]

In addition to denying Smith's motion to suppress the pills seized from the shorts, the trial court declined Smith's Rule 16 request to suppress the photo showing Smith wearing them.[5] The government conceded, and the court agreed, that the government had violated its Rule 16 obligation by failing to preserve the shorts. Contrary to Smith's assertion, however, the court did not perceive a "deliberate" or "intentional" destruction or loss of the shorts; it found the

---

[3] On September 16, 2013, over five weeks after his arrest, Smith authorized Iesha Miller to pick up his property at the D.C. Jail. She did so, minus the missing shorts, on October 9, 2013, as evidenced by a property receipt.

[4] At the pretrial suppression hearing, government counsel acknowledged that the D.C. Jail destroys inmate clothing "15 days after intake . . . and that they do not preserve for very long clothing that a prisoner arrives to D.C. jail in unless someone comes and picks it up within 15 days of intake."

[5] D.C. Super Ct. Crim. R. 16 (a)(1)(C), applicable at the time of trial, provided: "Documents and tangible Objects. *Upon request of the defendant* the prosecutor shall permit the defendant to inspect and copy or photograph books, papers, documents, photographs, *tangible objects*, buildings or places, or copies or portions thereof, which are within the possession, custody or control of the government, and which are material to the preparation of the defendant's defense, or are intended for use by the government as evidence in chief at the trial, or were *obtained from or belong to the defendant*" (emphasis added). This rule was amended in 2016 and now appears, as modified, in Super. Ct. Crim. R. 16 (c)(1)(E).

government culpable only of "negligence" and accordingly fashioned three Rule 16 sanctions. The prosecution was precluded from (1) arguing that the shorts fit Smith; (2) eliciting opinion testimony from the police about whether the shorts fit; and (3) objecting (as hearsay) to admission of Smith's prior out-of-court statement that the shorts were not his.

## II.  Rule 16 Issue

### A. Standard of Review

On appeal, Smith argues that the sanctions imposed against the government for failing to preserve the shorts were inadequate. Contrary to the trial court's finding, he maintains that the government had "deliberately destroyed the shorts after extracting from them all of the evidentiary value." As a consequence, he says, the "staged" photograph depicting his wearing the shorts at the scene of arrest (in an effort to show that they "fit") should have been withheld from the jury as an essential Rule 16 sanction.

In challenging the trial court's refusal "to suppress the photograph," Smith stresses that the court, as a matter of law, misapplied the factors required for determining appropriate Rule 16 sanctions. We review ultimately for abuse of trial

court discretion,[6] an analysis that — if we find legal error along the way — extends to determining, as a separate matter, whether the error was of a "magnitude to require reversal,"[7] or, instead, was "harmless" under *Kotteakos v. United States.*[8] Initially, therefore, we review de novo whether the court considered the proper factors in assessing whether and how to sanction the government for its Rule 16 violation.[9]

---

[6] *See Williams v. United States*, 77 A.3d 425, 437 (D.C. 2013) ("decisions whether and how to sanction the government for a violation of Rule 16 are committed to the discretion of the trial judge"); *Ferguson v. United States*, 866 A.2d 54, 59 (D.C. 2005) ("Generally, in reviewing a denial of a request for sanctions, we must ascertain whether the trial court abused its discretion.").

[7] (*Markus*) *Johnson v. United States*, 960 A.2d 281, 295 (D.C. 2008) (in reviewing for abuse of discretion, "if we find error, we must consider whether it was harmless.") (citing (*James*) *Johnson v. United States*, 398 A.2d 354, 366 (D.C. 1979) ("having found error, is it of a magnitude to require reversal.") (emphasis omitted)).

[8] 328 U.S. 750, 765 (1946) ("But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected."); *see Ferguson,* 866 A.2d at 65 (quoting *Kotteakos* in holding that appellant "was not substantially  prejudiced" by government's failure  to comply with Rule 16); *Jackson v. United States*, 768 A.2d 580, 584 (D.C. 2001) (remanding record for adequate findings to permit review of whether documents withheld in violation of Rule 16 were "prejudicial" under *Kotteakos*).

[9] *See Ferguson*, 866 A.2d at 59 (in reviewing trial court Rule 16 discovery determination for abuse of discretion, this court reviews for "correct interpretation and application of Rule 16, . . . a legal question, . . . de novo[,]" and if court denies the discovery request, this court "determine[s] whether the nondisclosure was

(continued . . .)

### B. Law Governing Evaluation of Trial Court Sanctions under Rule 16

Recently, in *Koonce v. District of Columbia*,[10] this court reconfirmed the following three criteria for evaluating trial court sanction decisions under Rule 16. We must weigh "(1) the degree of [government] negligence or bad faith involved; (2) the importance of the evidence lost; and (3) the evidence of guilt adduced at trial[,] in order to come to a determination that will serve the ends of justice."[11] This court has commonly applied these criteria verbatim to sanctions analysis in Rule 16 cases.[12]

_____

(. . . continued)
prejudicial") (quoting *Jackson,*768 A.2d at 584 (citing *Kotteakos*, 328 U.S. at 764-65.))

[10] 111 A.3d 1009, 1014 (D.C. 2015) (quoting *United States v. Day*, 697 A.2d 31, 35 (D.C. 1997) and *Cotton v. United States*, 388 A.2d 865, 869 (D.C. 1978)).

[11] *Id.* In *Koonce* and earlier cases, the comma bracketed in criterion (3) above is omitted. We add it to make clear that all three criteria are germane to serving the "ends of justice."

[12] We occasionally have employed somewhat different formulations for evaluating Rule 16 sanctions. For example, in *Robinson v. United States*, 825 A.2d 318, 331 (D.C. 2003) (quoting *Brown v. United States*, 372 A.2d 557, 560-61 (D.C. 1977)), we assessed the "'(1) the circumstances occasioning the loss; (2) systematic steps taken toward preservation; and (3) the magnitude of demonstrated evidentiary materiality.'" And in *Ferguson*, 866 A.2d at 59 (quoting *Lee v. United States,* 385 A.2d 159, 163 (D.C. 1978)), we applied "'(1) the reasons for the nondisclosure; (2) the impact of the nondisclosure on the trial of the particular

(continued . . .)

**1. "The Degree of Negligence or Bad Faith Involved" (culpability for the loss)**

We look, first, at culpability for the loss. For context we begin with the obvious: unless the government could prove that the shorts in which the drugs were found belonged to Smith, there could be no conviction. Thus, absent the shorts, the photo of Smith wearing them was essential to the government's case, and Smith's defense substantially turned on rebutting the government's prima facie showing, through the photo, that they fit him. As explained below, the trial court committed two errors. First, the government's fault was greater than the trial court found. Second, and contrary to another trial court finding, responsibility for loss of the shorts was not properly allocated, even in part, to appellant Smith.

_____

(. . . continued)
case; and (3) the impact of the particular sanction on the proper administration of justice in general.'" Our most recent decision, *Koonce*, and its forebears, see *supra* note 10, are derived from the original formulation in this jurisdiction in *United States v. Bryant*, 439 F.2d 642 (D.C. Cir. 1971). For that reason, we choose to apply the *Koonce/Bryant* criteria here.

### a.    The Government's Negligence

As we have noted, at trial the court rejected Smith's allegation that the government had deliberately destroyed the shorts.  Rather, the court attributed that loss to "ordinary negligence on the part of the government"; there was no "bad faith or any intention to hide material evidence" — no record basis "to believe that the government thought the shorts were somehow exculpatory or otherwise beneficial to the defense and sought to hide them from the defendant."[13]  The court elaborated:

> My sense of what happened is that Officer Artinian just did not understand the pertinence of the shorts . . . . It's somewhat surprising to me. He's been an officer for several years.  But I guess he's not a — he's not a narcotics investigator.  And I guess he was just thinking of this, as government counsel has said, really as a domestic violence investigation and didn't realize that these other issues were — were of importance.  That

---

[13]  In finding no "bad faith" by the government, the trial court implicitly found no constitutional violation.  *See Koonce*, 111 A.3d at 1014 ("[T]o show that a failure to preserve discoverable evidence that is 'potentially useful to the defense' violates due process, appellant must also establish that the government acted in bad faith" (citing *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988)). Although Smith's trial counsel argued that "the only remedy" for the missing shorts was "dismissal" of the prosecution, he never made a constitutional claim that the government's failure to preserve the shorts reflected bad faith — a finding we have held essential to a dismissal sanction under Rule 16.  *See Williams*, 77 A.3d at 437-38 (quoting *Day*, 697 A.2d at 36)).

said, I think he should have realized it. And that's why I think there's some negligence here.[14]

In finding "ordinary" or "some" negligence, the trial court limited the government's neglect to the actions of Officer Artinian, based on the officer's own apparent impression or assumption that the shorts were not exculpatory. As far as we can tell, moreover, the court appeared to understand the officer's neglect as an exercise of poor judgment, not as a violation of an MPD general order specifying that police "officers must preserve all potentially discoverable material" that "comes into the[ir] possession."[15] The government, however, has a Rule 16 obligation that transcends the judgment of an "individual officer."[16] "We have repeatedly recognized that the government has a general duty to preserve discoverable evidence under Superior Court Criminal Rule 16 (a)(1)(C) and long-established case law."[17]

---

[14] The jury was informed that Officer Artinian had been reprimanded and docked vacation time for an unrelated incident of mishandling prisoner property.

[15] *See* MPD General Order 601.02 I., IV.A. (2004).

[16] *Koonce*, 111 A.3d at 1016 ("The government's discovery obligations are measured by the standards set out in Rule 16, not the subjective notions of what an individual officer might 'seem to believe.'").

[17] *Id.* at 1013 (internal quotation marks and brackets omitted).

Earlier, at the pretrial hearing on sundry motions to suppress, the trial court appeared to recognize that Officer Artinian was not alone at fault. After citing the government's Gerstein proffer,[18] which referenced the drugs found in a "pair of men's shorts," the court remarked that the "U.S. Attorney's Office would have understood the evidentiary significance of those shorts" and "probably should have gotten a search warrant" to seize them. But the court apparently did not factor the prosecutor's inaction into the negligence calculus.

We may assume that an arrestee's clothing, exchanged for prison garb, does not inherently signal evidentiary significance (in contrast, for example, with a videotape of an arrest scene). But the trial court here assuredly recognized before trial that the shorts the police had ordered Smith to wear — distinguishable from a arrestee's usual clothing by Smith's disclaimer of ownership — qualified for preservation under Rule 16. Thus, despite the court's observation at trial limiting government culpability to the negligence of Officer Artinian, the court had to be aware, from the pretrial hearing, of the significance of the shorts for the defense, and thus of the prosecutor's — not just the officer's — responsibility to preserve that evidence.

---

[18] *Gerstein v. Pugh*, 420 U.S. 103 (1975).

Accordingly, given the prosecutor's as well as the officer's negligence — only the latter of which the court clearly appears to have factored into its culpability analysis — we cannot say that the government's fault was limited to the court's reliance on Officer Artinian's simple negligence. To be sure, we have observed that "[t]he trial court has considerable discretion in determining the degree of negligence or bad faith involved in the failure to preserve evidence," and "[w]e will disturb the trial court's findings that the government did not act in bad faith or was not grossly negligent only if those findings are plainly wrong or without facts to support [them]."[19] In this case, however, we must conclude that the facts do not support a limitation of the government's culpability to ordinary negligence (even if we were to assume that the trial court's awareness of the prosecutor's responsibility was folded into the ordinary negligence determination). We are satisfied that evidence supports the trial court's finding that the government did not "deliberately" fail to preserve the shorts handed to Smith. But on this record, given the failure not just one, but two, responsible government departments

---

[19] *Koonce*, 111 A.3d at 1014 (internal citations omitted).

to assure the required preservation, we perceive no less than gross negligence by the government.[20]

**b. Erroneous Assignment of Partial Culpability to Appellant**

The trial court, however, did not limit its negligence analysis to the government; the court injected the question whether Smith himself shared responsibility for assuring retention of the shorts. This, too, was clear error.

Early at the pretrial hearing, counsel for Smith informed the court that neither he nor "anyone else [he] was aware of" (implying previous counsel at Smith's arraignment) had told Smith "to preserve those shorts." Later at the hearing, the prosecutor explained that the D.C. Jail followed a standard procedure: holding inmate clothing no longer than 15 days after intake, subject to destruction unless retrieved on the inmate's behalf. Nonetheless, in learning of that policy, the

---

[20] *Cf. Day*, 697 A.2d at 35-36 (in negligent vehicular homicide case, the government was found grossly negligent in failing to preserve from destruction appellant's Oldsmobile of "paramount significance" to defense preparation, but dismissal of the indictment was reversed, and the case was remanded for trial, because dismissal would have been justified, as violation of due process, only upon showing of bad faith).

trial court did not address whether the government, knowing the importance of the shorts to the defense, had a duty to make timely disclosure of that policy at arraignment or otherwise within the 15 days. Instead, the trial court responded to the destruction policy, as applied to the shorts, merely by saying that it "sounds like they're probably destroyed." The court then went on to assign partial responsibility for loss of the shorts to Smith:

> [T]he equities [were] not entirely on the defendant's side, given the defendant actually had possession of the shorts for some period of time when he was under arrest and before he was transported to the D.C. Jail and that he and his lawyer certainly had just as good an opportunity as the government to understand the materiality of these shorts.

The court, in other words, was suggesting that although Officer Artinian had seized the MDPV pills at the scene of arrest, Smith continued to wear the shorts until he was processed at D.C. Jail, and then at the court, leaving him (once he had a lawyer) in a position to assure their retention as evidence. Exploiting that opportunity, reasoned the court, would have supported Smith's assertion at the scene of arrest (if true) that the shorts were not his.

Contrary to the trial court's statement quoted above, there is nothing of record to indicate that Smith had an opportunity to assess the legal significance of the shorts between his arrest and intake at the jail on August 9, 2013, and his arraignment the next day in court when counsel was appointed for him. Smith concedes in his brief that the Department of Corrections (DOC) provided him "with a notice saying that it was the [Department's] policy to destroy all property taken from inmates, including clothing, if not picked up within 15 days." However, neither Smith's brief nor the trial court record discloses when Smith received this notice; nor does the government argue that the notice shifted any responsibility to Smith for retrieval of the shorts.[21]

In any event, whatever notice of the 15-day destruction policy Smith may have received, such notice was irrelevant to the trial court's sanctions analysis. The trial court had already determined that the government had violated its obligation to disclose, pursuant to Rule 16, a tangible object in its custody or

---

[21] Perhaps the jail's clothing-destruction policy was stated on the form that Smith signed when he exchanged street clothes for jail garb. *See* Department of Corrections Policy and Procedure, 4050.1F, Attach. 1, Inmate property (2013). That policy also was stated on the DOC website. *See* Department of Corrections Policy and Procedure, Inmate property No. 4050.1F § 17 (2013), https://doc.dc.gov./page/doc-program-statements. The government, however, has cited neither of these sources; nor has it argued whether — or how or when — Smith received such notice.

control.  We are aware of no authority that would permit notice of a policy to destroy objects in the government's custody or control to override the government's "general duty to preserve discoverable evidence" (here the shorts) under "Rule 16 (a)(1)(C) and long-established case law."[22]  Nor is there any evidence that Smith in any way thwarted the government's preservation of the shorts.  Accordingly, we are unwilling to say that the government's failure to preserve the shorts in its custody can be mitigated by an opportunity the defense may have had to prevent their disappearance.[23]

**2. "Importance of the Evidence Lost" (magnitude of adversity to defense preparation)**

We turn, next, to the importance of the evidence lost — the magnitude of

---

[22]  *Koonce*, 111 A.3d at 1013 (quoting *Williams*, 77 A.3d at 435 (quoting *Bean v. United States*, 17 A.3d 635, 638 (D.C. 2011))).

[23]  Although the trial court erroneously found that the government's failure to preserve the shorts was no more than "some" or "ordinary" negligence, and that Smith was partly at fault for their loss, it is important, in fairness, to note that the court *sua sponte* raised the shorts-preservation issue.  The court asked where the shorts were when Smith's counsel, pretrial, objected to admission of the photograph on the ground that, in forcing Smith "to wear those shorts," Officer Artinian had created "tainted evidence" — "evidence from non-evidence."

adversity to defense preparation — absent remedial sanctions.[24] At the outset of trial, the court recognized that the photograph of Smith wearing the shorts, which Smith sought to keep from the jury, was highly material to the government's case. Indeed, if the photo showed that the shorts fit Smith, it would support a finding that the MDPV pills found on the shorts were Smith's as well. Thus "ultimately," the court observed, "the photograph is probably going to be viewed as the most relevant evidence to the jury."

Smith does not dispute that the contested photo entered in evidence depicted him wearing the shorts. At a pretrial colloquy with counsel, however, the trial court observed that the photo did not necessarily show a clear fit, if only because Smith's shirt was pulled over the waist.[25] Nonetheless, with Smith standing up, the shorts fit well enough not to fall down. Moreover, if not precluded by sanction, officers at the scene would have been free to testify that the shorts fit Smith, and the prosecutor, if not also precluded, would surely have reminded the jury of that testimony in closing argument.

---

[24] *See Koonce*, 111 A.3d at 1014 ("importance of the evidence lost"); *Ferguson*, 866 A.2d 54 at 59 ("impact of the nondisclosure on the trial"); *Robinson*, 825 A.2d at 331 ("magnitude of demonstrated evidentiary materiality").

[25] According to the trial court, it was "unfortunate that the shirt covers up the waistline of the shorts. You can't see . . . at all whether the waist is the correct size."

Had the shorts been available at trial, we cannot say that Smith could have proved that they did *not* fit. But with their loss — without effective mitigating sanctions in place — it is evident from the photo (and Officer Artinian's testimony) that Smith's denial that he owned the shorts faced substantial, if not insurmountable, roadblocks.[26]

### 3. "Evidence of Guilt Adduced at Trial"

We consider, finally, the third *Koonce* criterion for evaluating sanctions: "the evidence of guilt adduced at trial[,] in order to come to a determination that

---

[26] Smith's hearsay denial to Officer Artinian at the scene of arrest was the only evidence before the jury that Smith disclaimed ownership of the shorts. Smith now argues — for the first time on appeal — that loss of the shorts unfairly undermined his denial of ownership in a way unrelated to how they fit. Officer Artinian testified that when he handed the shorts to Smith, Smith denied that they were his because they had a "hole" or "tear" in the crotch, a feature not disputed at trial. Smith now complains (without having done so at trial) that the officer's testimony erroneously implied that Smith could not have seen the hole when the shorts were handed over, and thus that in recalling the hole, Smith must have known the shorts were his. Smith never makes clear how having the shorts in evidence at trial would have refuted that implication. Moreover, the officer's testimony did not unequivocally say that Smith could not have seen the hole during the hand-over. Finally, Smith's crotch-tear argument lacks currency because the prosecutor did not ever mention at trial the implication of Officer Artinian's testimony that Smith posits — an implication that never was part of the government's case and, in sum, has no force on this record.

[would] serve the ends of justice."[27] The evidence of Smith's guilt was substantial, primarily (1) pills (according to expert testimony) filled with an unlawful controlled substance taken from shorts that were identified to the police as Smith's by his girlfriend, and (2) shorts that appeared to fit Smith, as evidenced by a photo from the scene of the arrest and seizure. Again: absent sanctions effectively mitigating unavailability of the shorts at trial, Smith's opportunity to rebut the government's prima facie case that the shorts and pills belonged to him was undoubtedly jeopardized.

Our evaluation of this "guilt" criterion requires us to determine whether the sanctions that limited prosecution tactics were both responsive and proportional to the government's failure to produce the shorts, in order to ensure not only that any advantage to the government from that loss was effectively mitigated but also to provide adequate deterrence against similar derelictions in the future.[28] We are satisfied that the trial court adequately satisfied these concerns.

---

[27] *Koonce*, 111 A.3d at 1014; see *supra* note 11.

[28] *See Lee v. United States*, 385 A.2d 159, 163-64 (D.C. 1978) (sanction for violating Rule 16 "served neither to redress the conceded negligence of the government nor to deter it in the future," and therefore was "not just under the circumstances").

Because the trial court could not dismiss the case absent a showing that the government had acted in bad faith,[29] the trial court took mitigation of the Rule 16 violations very seriously; it carefully crafted sanctions that precluded the government from capitalizing on that violation. In recognizing that a central issue would be whether the shorts fit Smith, the court, as we have noted, precluded the government from: (1) arguing that the shorts fit Smith; (2) eliciting testimony from the police about whether the shorts fit; and (3) objecting (as hearsay) to admission of Smith's prior out-of-court statement that the shorts were not his.

At the same time, the trial court indicated that it did not want "to go overboard." The court had observed at a pretrial hearing that one could not see from the photo "whether the waist is the correct size,"[30] but the court said later at trial that the photo was not misleading: there was no reason to believe that the photo "inaccurately portray[ed] the way that the defendant fit into those shorts." The court ruled, accordingly, that barring admission of the photograph would not be appropriate. The court added that the government was free to ask the jury to draw its own conclusions from the photograph and "consider how well the shorts

---

[29] See *supra* note 13.

[30] See *supra* note 25.

fit on the defendant in determining whether the government has proved beyond a reasonable doubt that the drugs recovered from the shorts were in the defendant's possession."

In this way, the court — we believe properly — sought to achieve (in its words) the "goal" of "strip[ping] what [it] consider[ed] to be unfair — any unfair advantage that the government might otherwise get from the absence of the [shorts] from the trial but not to . . . prevent the government from presenting what is, I think, relevant but not distorted evidence."

\*\*\*\*\*

In sum, in considering whether and how to sanction the government for its Rule 16 violations, the trial court erred in assessing culpability, the first *Koonce* criterion; it understated the government's negligence while improperly allocating partial fault to Smith. The court, however, satisfied the second and third criteria, effectively recognizing the importance of the evidence lost, as well as properly accounting for the evidence adduced at trial, when crafting the sanctions.

## C. Harmless Error

We now must determine whether the trial court's errors in finding the government responsible for ordinary, rather than gross, negligence, and assigning partial responsibility to Smith for loss of the shorts, resulted in sanctions insufficient to "serve the ends of justice" — and thus constituted an abuse of discretion. To the contrary, the sanctions were indeed sufficient. In spite of the court's errors, the three sanctions adequately compensated the defense for the missing shorts. It is "highly probable" that the trial court's errors "did not affect the verdict"; they were harmless — as we shall explain.[31]

*First,* the trial court conscientiously exercised its discretion. Although the court understated the government's culpability, that error did not appear to affect, let alone undermine, the court's sanctions analysis. Without regard to the government's degree of fault, the court clearly expressed a desire not to allow the government an "unfair advantage." Nor is there any evidence that the court cut back on sanctions because it erroneously believed that Smith had been partially

---

[31]   *See Robles v. United States*, 50 A.3d 490, 495-96 (D.C. 2012), *as amended on denial of reh'g and reh'g en banc* (May 15, 2013) (under *Kotteakos*, the government must show that it is "highly probable" that "the error did not affect the verdict").

responsible for loss of the shorts. In sum, the trial court took great care in fashioning sanctions that would appropriately limit the impact of the photo as a substitute for the shorts.[32]

*Second*, in addition to the trial court's conscientious exercise of discretion, the record convinces us, objectively, that the court's sanctions were effective. They were powerful; the government was precluded in three significant ways from eliciting evidence that the shorts fit (evidence that Smith could otherwise not effectively rebut because the shorts were gone). More specifically, and significantly, the first two sanctions prevented the prosecution from "pounding home" to the jury, through police witnesses and closing argument, that the pants doubtless fit Smith[33] — sanctions consistent with the trial court's own perception

---

[32] Relying on language from *Koonce*, Smith contends that the missing shorts were "central to the government's proof," 111 A.3d at 1021, were therefore essential "for use by Mr. Smith," and thus could not be represented at trial by a substitute "staged photograph." As in *Koonce*, however, where we upheld sanctions calibrated to compensate for a missing videotape and liquor bottle, we perceive no basis for suppressing the photo as a matter of law without inquiry as to whether sanctions in lieu of the missing shorts would be "just under the circumstances." *Id.* at 1020 (quoting *Gethers v. United States*, 684 A.2d 1266, 1272 (D.C. 1996)).

[33] In closing argument, therefore, the government referenced the fit of the shorts, without objection, in only a general way, stating that "[m]any people when presented with a pair of shorts would not be concerned about the ownership of those shorts or perhaps whether they fit or not."

of the photograph's inconclusive value.[34]  Nor, because of the third sanction, could the prosecutor directly question Smith's hearsay denial that the shorts were his.[35] Accordingly, aside from the photo, the government could not effectively corroborate whether the shorts fit Smith.

*Finally*, Smith's defense, as enhanced by the sanctions, was substantial, not weak.  It consisted of:  (1) Smith's denial that the shorts belonged to him; (2) the innuendo (government malfeasance) attributable to the very fact that the shorts were missing[36] (although defense counsel was not allowed to argue that the government had failed to produce the shorts because "they knew they didn't fit" Smith); (3) counsel's suggestion that the shorts themselves might have revealed

---

[34]  See *supra* note 25.

[35]  Because Officer Artinian, in the government's case, acknowledged that Smith had denied ownership of the shorts, it is not clear how the government could have objected to Smith's hearsay denial. We can reasonably infer from the third sanction, however, that the court would not have permitted the government to directly question that denial.

[36]  During closing arguments, defense counsel argued that the shorts were not Smith's, asking, "Where are they?  Where are the shorts?  Where are the shorts?  Where is the evidence?  Where are the shorts?  No DNA.  No name inside of the label; not even an understanding based on the photograph and we have the shirt coming over the waist.  Officer Artinian, how does he put the shorts on?  Well, — well, with difficulty."

ownership through DNA analysis or a label implicating someone else;[37] (4) counsel's argument that the photo did not assuredly show that the shorts fit Smith — a perception (as previously noted) that was shared by the trial court;[38] and (5) the suggestion that the shorts may have belonged to a recent houseguest of Ms. Miller.[39]

Accordingly, in light of the benefits to the defense from the sanctions imposed (whether the government's negligence was "ordinary" or "gross"), it would be a stretch to conclude that any discernible prejudice to the defense from the photo was serious enough to warrant its suppression — especially when suppression would create severe (perhaps conclusive) jeopardy to the government's case[40] without findings that the government had acted deliberately

---

[37] See *supra* note 35.

[38] See *supra* note 25.

[39] See *supra* note 2.

[40] Suppression of the photo would not have been a dismissal of the indictment, a sanction justified only upon a constitutional, due process violation attributable to bad faith. *See Day*, 697 A.2d at 35-36 (citing *Arizona v.Youngblood*, 488 U.S. 51, 58 (1988)); *accord Williams*, 77 A.3d at 437-38. On the record here, however, suppression of the photo, as a practical matter, may well have led to abandonment of the prosecution.

or in bad faith.[41] Under these circumstances, we cannot conclude that the trial court abused its discretion in fashioning the sanctions, which in our judgment were carefully crafted to put appropriate limitations on the government's use of the photograph. After reviewing the proceeding, as limited by the trial court's sanctions, we cannot say to any meaningful level of certainty that the loss "substantially prejudiced" Smith.[42] Although the trial court committed two discretionary errors, they were "harmless," not of a "magnitude to require reversal" under *Kotteakos*.[43]

### III. Sufficiency of the Evidence for Distribution of MDPV

Smith next argues that the evidence was insufficient to prove "the identity of the alleged controlled substance" (MDPV) or his "intent to distribute it," as required for conviction of PWID.

---

[41] See *supra* note 13 and accompanying text.

[42] *Ferguson*, 866 A.2d at 65, 67; see *supra* note 8.

[43] See *supra* notes 8 & 9.

## A. Expert Testimony

Smith begins by citing *Digsby v. United States*[44] for the proposition that, for possession with intent to distribute, the evidence must be enough to "conclude beyond a reasonable doubt that a measurable amount of [the controlled substance] was seized."[45] To establish that amount from the pills seized from the shorts, the government relied on testimony by a "forensic chemist" from the Drug Enforcement Agency (DEA), Stephen Michael Demchuk, whose qualifications as an expert in "analysis of controlled substances" were not challenged. Citing DEA policy, Demchuk tested one, randomly selected pill of the 79 seized and found that it contained .28 grams net weight of "3-4 methylenedioxypyrovalerone" (MDPV).[46] Demchuk further testified that, although he had tested only one pill and did not "know what the other tablets were," he had "looked at each of the

---

[44] 981 A.2d 598 (D.C. 2009); *accord Thomas v. United States*, 650 A.2d 183, 184 (D.C. 1994) (en banc) (for conviction of controlled substance violation, "government need only prove there was a measurable amount of the controlled substance in question"); *Price v. United States*, 746 A.2d 896, 899 (D.C. 2000) (meaning that the detectable amount must be "quantifiable," and more than a "trace.").

[45] *Digsby*, 981 A.2d at 608.

[46] At the time Demchuk received the bag there were 76 pills and several pill fragments which, he concluded, accounted for the three other pills of the original 79.

tablets and the markings on them. They were white, round tablets with a duck imprint on them. They all appeared identical."

Smith does not dispute that the one pill tested contained MDPV. Nor does he question that one pill was a measurable amount, meaning it was "quantifiable," not merely a "trace" of the substance.[47] Rather, Smith contends that DEA expert Demchuk, by testing only one pill, did not rely on "a scientifically valid sample" sufficient to establish reliable proof that the remaining pills contained an unlawful controlled substance. Indeed, Smith contends in his brief — correctly — that Demchuk "offered no testimony" beyond exterior appearance "to support any inference that the pills which he did not test contain[ed] the same substance as the pill which he did test."

The government, however, relied on the testimony of another expert for evidence of Smith's intent to distribute MDPV, rather than mere possession for

---

[47] See *supra* note 42. Neither party requested a lesser included offense instruction that would have permitted conviction based on mere possession.

personal use of whatever amount he had.[48]  That "narcotics expert," MPD Detective George Thomas, testified that anyone who possessed "in excess of seven [MDPV] pills" would have "an amount significant enough for distribution."  He further testified, accordingly, that for personal use an individual would have, at most, no more than five (he later said seven) pills.  Carrying more than that for personal use, he added, was uncommon because "a user always runs the risk of getting ripped off just on one pill. . . .  [T]hey're not going out and buy 25 to 50 pills at a time."

Then came a critical question from the prosecutor:  "[h]ow confident are you that these pills [in the bag taken from Smith] are of the same manner and character?"  Detective Thomas answered, "I'm 95 percent confident that they are the same manner, the same texture; they'll produce the same chemical analysis or color reaction from a [positive] field test associated with these pills."[49]  (Earlier,

_____

[48]  We have said that the government can prove specific intent to distribute "from expert testimony and the possession of a quantity of drugs that exceeds a reasonable supply."  *Taylor v. United States*, 662 A.2d 1368, 1371 (D.C. 1995).  An expert, therefore, will commonly testify about the "packaging, and value of the drugs possessed," in order to distinguish the situation from possession for mere personal use.  *Spriggs v. United States*, 618 A.2d 701, 704 (1992).

[49]  An unidentified pill taken from the bag in the shorts had been field-tested at the police station after Smith's arrest and tested positive for amphetamines.  A

(continued . . .)

Thomas had testified that the pills did not appear to be counterfeit because they all had "clear valleys and peaks," not "pits and the ridges" typically found on counterfeits.) The detective then concluded, based on the volume and his estimated value of 79 pills ($3,800), that Smith had possessed them "with the intent to distribute and not for personal use."

There was no objection to any substantive testimony of Detective Thomas.[50]

_____
(. . . continued)
field test is not dispositive but nonetheless can "'constitute evidence' of the identity of the seized substance." *Digsby*, 981 A.2d at 605 (citing *Duvall v. United States*, 975 A.2d 839, 845-46 (D.C. 2009)).

[50] Counsel for Smith did not challenge the qualifications of Detective Thomas to testify as an expert in the areas of "distribution," "packaging," and "pric[ing]" narcotics, as well as on MPD and DEA "procedures for safeguarding narcotics evidence." Nor did counsel object to the substance of the Thomas testimony summarized in the text above. Counsel limited his objections to the prosecutor's questions of Thomas, on redirect examination, about the size, shape, and color of the pills (sustained as irrelevant) and about the defense intimation that pills in the batch may have been counterfeits (questions clarified). Counsel, moreover, did not object to the prosecutor's closing argument to the jury or to the trial court's PWID instructions to the jury, which virtually tracked the ones we call "standard." *See* Criminal Jury Instructions for the District of Columbia, No. 6.201 (4th ed. rev. 2008).

**B. Arguments on Appeal**

On appeal, Smith contends that Detective Thomas was "not qualified to opine on probability or statistical evidence," and that he had erroneously relied on the "appearance" of the untested pills, not on analysis of their "substance," to establish that the quantity of pills was great enough to reflect an intent to distribute. Smith calls the detective's testimony "junk science," stressing that the prosecutor, in closing argument to the jury, relied on an impermissible inference from the one, tested pill that "all the pills in the bag were bath salts."

We must reject these contentions, as Smith offered no objection at trial challenging Detective Thomas's expert qualifications or his testimony that he was "95 percent confident" that all the pills taken from the bag in the shorts contained MDPV.[51] The trial court was well aware that Smith appeared satisfied to have the Thomas testimony go to the jury intact. In denying Smith's motion for judgment

---

[51] In claiming insufficiency of the evidence, Smith maintains that the government violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose that the testimony of MPD Detective George Thomas in support of the charged intent to distribute "was not scientifically reliable." Having rejected Smith's argument, absent objection at trial, that the detective had engaged in "junk science," we perceive no room for this argument.

of acquittal at the end of the government's case (after which the defense rested without presenting additional evidence), the trial court added:

> I will say I was somewhat surprised by the redirect examination testimony of Detective Thomas, *which came in without objection*, that he's 95% confident that all of these pills are the same. I actually think that's outside his area of expertise, but there was no objection. And it came in so *I think it's in the record, for whatever it's worth*. (Emphasis added.)

Absent objection, therefore, the following evidence was before the jury: that one pill taken from the shorts worn by Smith, retrieved from the scene of arrest by Officer Artinian, tested positive for MDPV; that a field-tested pill found in the shorts was also MDPV-positive; that all the pills found in the shorts looked alike; and that according to Detective Thomas, a narcotics expert: the pills did not appear to be counterfeit; he was 95% sure, from their "manner" and "texture," that the pills would produce the "same chemical analysis or color reaction from a field test associated with these pills"; and that because of the number and estimated value of the pills (76 valued at $3,800), Smith had possessed them "with the intent to distribute and not for personal use."

Based on this evidence (including any that could be called circumstantial),[52] we have no doubt — nor did the trial court in denying Smith's motion for judgment of acquittal[53] — that a reasonable jury could find Smith guilty beyond a reasonable doubt of possession with intent to distribute a schedule I controlled substance, MDPV.[54]

## C. Reply Brief Argument: Lack of Foundation for Detective Thomas's Testimony

For the first time in his reply brief — citing the trial court's comment that Detective Thomas appeared to be "outside his area of expertise" when testifying that he was "95% confident that all of these pills are the same" — Smith asks this court to find plain error in the trial court's allowing that testimony to go to the

---

[52] *Bernard v. United States*, 575 A.2d 1191, 1193-94 (D.C. 1990) (circumstantial evidence sufficient to prove identity of suspected unlawful drug).

[53] In his motion for judgment of acquittal, counsel for Smith focused almost exclusively on challenging the chain of custody of the pills, which is not an issue on appeal.

[54] We have affirmed convictions in similar cases with fewer drugs worth significantly less than the drugs seized in this case. *See, e.g.*, *Taylor*, 662 A.2d at 1371 (crack cocaine worth $180 sufficient for conviction of possession with intent to distribute); *Spriggs*, 618 A.2d at 704 (eight packets of heroin and five packets of cocaine worth approximately $470 sufficient for conviction of possession with intent to distribute).

jury.[55]  We decline this invitation.  "[I]t is the longstanding policy of this court not to consider arguments raised for the first time in a reply brief."[56]  Accordingly:

> [p]oints not urged in a party's initial brief are treated as abandoned. . . .  We follow this rule because the failure to raise an issue in one's brief prevents the opposing party from briefing the issue, and it prevents both this court and opposing counsel from preparing for its consideration.[57]

In extraordinary circumstances, of course, we could waive this limitation in order to pursue further review.  Here, however, the record does not suggest a reason why we should consider this new argument challenging intent to distribute, especially when the government will have lacked an opportunity to be heard on it.  As to the evidence itself, the DEA test of one pill, coupled with a field test of another from the same bag — a bag containing at least 76 look-alike pills —

---

[55]  As noted earlier, see *supra* note 50, Smith did not question Detective Thomas's expertise at trial.

[56]  *Aeon Fin. LLC v. District of Columbia*, 84 A.3d 522, 530 (D.C. 2014) (quoting *Marshall v. United States*, 15 A.3d 699, 711 n.2 (D.C. 2011) (internal quotation marks omitted)).

[57]  *In re Shearin*, 764 A.2d 774, 778 (D.C. 2000) (citations omitted).

strongly suggests a quantity of pills containing MDPV. We therefore shall not extend the inquiry to plain error review.


*****


For the reasons explained above, the judgment of conviction is affirmed.


*So ordered.*


FERREN, *Senior Judge*, concurring: Without dispute, the government's grossly negligent loss of appellant Smith's shorts — evidence material to both the defense and the prosecution — was a violation of Super. Ct. Crim. R. 16. Fortunately for the government, however, the prosecutor had a photograph of Smith wearing shorts at the scene of arrest — evidence in lieu of the missing shorts that was essential to the government's case. If that photo were to be admitted in evidence, however, the trial court was required to impose effective Rule 16 sanctions on the prosecution's use of the photo, in order to compensate the defense for unavailability of the shorts in the courtroom. Implicitly, therefore, the law, and thus this court's analysis, is premised on an assumption that availability of the

shorts at trial, without sanctions, would have been preferred by the defense over admission of the photo, limited by sanctions. This may be one of the rare cases, however, in which the government's loss of evidence was of benefit, not a burden, to the defense.

We have an interesting question: how, exactly, did the fact that the shorts were missing affect Smith's defense preparation? Although the government, as well as the trial court, agreed that the shorts were "material" to Smith's defense, it is not clear how their presence at trial necessarily would have enhanced Smith's argument that the shorts were not his.

To illustrate this uncertainty, we should look, first, at Smith's defense without the shorts in hand — a defense, enhanced by sanctions that we have characterized as "substantial, not weak."[1] Can we be sure that if the shorts had been available, Smith's case would have been stronger? — that Smith (absent a plea bargain) would have put them on in rebuttal to show the jury that they did not fit? Depending on the truth about ownership, which we cannot know, there may

---

[1] See *ante* at 23-24.

well have been a more conclusive case for conviction if the shorts had been available for plea negotiations or trial.

Based on the photo evidence alone it would appear that the government had the upper hand with the missing shorts. But even worse for Smith, if the shorts did belong to him (as his girlfriend told Officer Artinian), there is sound reason for concluding that Smith's defense actually benefited from the jail's clothing destruction policy and the government's reliance on the photo evidence, limited by the sanctions. All things considered, therefore, loss of the shorts was material to defense preparation, but we cannot say to any meaningful level of certainty whether the loss did — or did not — in reality prejudice Smith.

None of this speculation matters for resolving the Rule 16 issue — nor should it. When the government is responsible for the loss of evidence presumptively critical to the defense, Rule 16 sanctions must be imposed to assure fairness to the accused. The question thus becomes whether, in light of the sanctions, the Rule 16 violation — the loss of the shorts — was nonetheless harmless. Because we cannot know whether the shorts, if available at trial, would have helped or hurt Smith's defense, we cannot permit speculation of the sort I've

engaged in here play a part in the harmless error analysis. We are limited, as in all cases, to determining indirectly — as objectively as possible by application of the *Koonce* criteria[2] — whether the record supports a conclusion that the government's errors, as mitigated by sanctions, were harmless or of a magnitude requiring reversal.

For the reasons stated in the court's opinion, I am satisfied that the trial court's errors, as mitigated, were harmless, and that the judgment of conviction should be affirmed.

---

[2] *Koonce v. District of Columbia*, 111 A.3d 1009, 1014 (D.C. 2015).